Case number 20-1620. Archer Western Contractors LLC petitioner versus United States Department of Transportation and Federal Aviation Administration. Mr. Straw for the petitioner, proposed contract change and inefficiencies. Mr. Macon for the petitioner, the HORC issues. Ms. Niozzi for the respondent. Good morning council. Good morning your honor. You may proceed. Well thank you your honor. Good morning again and may it please the court. My name is John Straw for petitioner Archer Western. I and my co-counsel Mr. Macon will be addressing the three main issues in this appeal. I will take care of the two timeliness issues of proposed change 16 and disruptions and Mr. Macon will then address the HORC issue. So let's talk about your definition of accrual. Thank you your honor. A claim accrual requires that all events that fix liability must have occurred and permit assertion of a claim. That's under 14 CFR 17.27. Here those events didn't occur until at the earliest there was a duty to perform the changed work which happened April 3rd 2013. At the latest they accrued when the FAA failed to agree to the when your client submitted to the administration an estimate of costs and delays stemming from proposed contact contract change 16. Thank you your honor. So as of February 7th the damages were capable of reasonable estimation but not all of the events had yet occurred. The event that had yet to occur was an actual direction to do that work. What I'm trying to understand is your client knew what he or at least he told the administration what the estimate of cost was going to be in the delay to completion of the contract. Why didn't he have full knowledge at that point? He didn't your honor because there was no written to do the work yet and that's similar to an ODRA case in 2013 of LNN MKB joint venture. There the ODRA said that no claim accrued until there was a written order to actually do the work. In fact they denied the contractor's motion for summary judgment in that case because even though there was forward pricing like there was here there was yet to be a written directed to do that work. Similarly the case of Jensen which is a general services board of contract appeals decision. In that case before there was a written order to apply a third coat of paint the court said that it was as if there was no agreement there was no contract to actually perform that extra work. The written order was required and here it didn't happen until the earliest on April 3rd. In fact the FAA knew that it hadn't happened yet because a couple of days before that the FAA chief engineer Mr. Brinker emailed the contracting officer and said we know Archer Western is waiting on this order to do this work please tell them to do it. That order came then on April 3rd. There are a couple of cases that the FAA has asserted in its briefing that I'd like to address. One of which is the case of electric boat decided by the federal circuit just last year. In that case the claim accrued when OSHA changed the regulation but in that case the parties had agreed that all it took was that one event to create the liability. It was a pre-agreed condition kind of like the ASFA case which is an ASBCA case where when the deadline passed to complete the project on time liquidated damages immediately accrued. The parties agreed that all it took was passing that deadline in ASFA. In Zaffer upon which the FAA also relies the court of federal claims held that at the point at which the delays began the claim did accrue but at that same time there was already an obligation to perform the delayed work. Here there was no obligation to perform the proposed change 16 item 10 until there was a written order and that didn't notice of contract dispute. It's uh your honors if I may. Mr. Strahl what about the equitable adjustment argument? I actually thought of your two arguments with regard to claim number one. I thought that was the stronger of the two. Can you kind of spell that out a little bit? Certainly your honor thank you and under the terms of the contract when there was a quote agree end of quote then a contract dispute could be filed. It had arisen at that point. That didn't happen until December 2014 when the FAA finally rejected the REA and issued the unilateral contract change. The FAA has now argued that the request for equitable adjustment process simply lengthens the negotiation period and they have cited to a few cases to support that one of which is CEMS which is a court of federal claims decision. In that case the court said quote contractors performance requirements must be enlarged and the additional work results from a direction of the contracting officer. A dispute didn't arise until there was a failure to agree. In fact do you think do you think that you could have gone to the ODRA with regard to the delay at issue in claim number one? Do you think you could have gone to the ODRA before the equitable adjustment was denied? I think we could have but I don't think we had to at that point. Although we had a written order the contract directed Archer Western to follow the changes process. In other words why would you escalate it to the ODRA before you had to? In fact when there was a direction on April 3rd 2013 to do the work the contracting officer in that same letter said if you disagree go follow the changes process and file a request for equitable adjustment. With some of the time that I have remaining if I could turn to the disruptions argument unless there's any other questions with respect to the first claim accrual argument. With respect to disruptions the ODRA arbitrarily ignored some of the additional supplemental information that was provided with the notice of contract dispute which spells out the disruption claims in significant detail over several thousand pages. But even before all of that the notice of contract dispute itself especially with respect to proposed change 16 referenced specific impacts there. And in exhibit 13 attached there too talks about cumulative impacts. So the ODRA arbitrarily did not pay sufficient attention to both the substance and the same operative facts in the notices of contract dispute and relied more upon form. They didn't look at the exhibits attached there too as well with sufficient detail which is similar to the Martin Resnick case another ODRA case. Mr. Stroh under which count of the initial notices do you say that you intended to bring the cumulative impact claim? The cumulative impact claim arises from all the facts from all the counts. The very nature of that claim is retrospective and comprised of all the various changes and issues that arose on the project. I thought there's something in the rules that says you have to specify each legal claim. Now you don't have to use magic words I agree with you about that but to say that the cumulative impact was was kind of you know emanating from all of the counts seems very inconsistent with the requirement that that when you go to the ODRA you list each individual claim. So thank you for that question your honor. I would like to address it however I'm into my rebuttal time. If I may, may I address this and still keep my three minutes for rebuttal? Well let's see how it goes. Why don't you answer the judge's question? Thank you your honor. So with respect to your honor's question the case of Alborici which is an ASBCA case said that you can decide and appeal and have jurisdiction to do so under a different legal theory even if that specific legal theory isn't articulated as long as the same operative facts supporting that theory are pled throughout the complaint or throughout the notice of appeal. It's also similar to the case of say that on appeal you can argue a new theory based on an analysis of facts that you didn't offer. In other words just saying you know one two three four five these are separate claims there was disruption that's not enough. So your honor I believe it is and I believe under the under these cases it is to the extent that you have to consider all the same operative facts. The Placeway case said that where form was given more weight over the substantive facts the lower court was actually reversed because they were focusing too much on form. Here not only did were there specific impacts alleged in the notice of contract dispute but the supplemental information that was provided as a part of the dispute file laid out all cumulative impacts which is similar to the Resnick case an odor case. And with that your honors I'm approaching my time. All right thank you counsel we hear from co-counsel. Yes your honor thank you for your time today my name again is Stephen Mecham and I'm addressing the duct issue. As set forth in our briefs the government has the burden of proof to show that the contractor did not comply with the specifications. Odra did not find that the ductwork did not comply with the specifications rather the odor found that the risk of future delamination was reasonable. In other words at the time that it was rejected there was no delamination. The ductwork complied with the specifications. The specification admittedly had a very low threshold but the specifications indicated that all that it had to do was line the duct. Well let me just be clear about that. I thought your argument was more and let me be clear you didn't say it this way but there has to be some expert evidence on this doesn't there for the government to need its proof burden of proof. I mean the government brief reads like well everybody knows it's the same manufacturer etc but that's not what the requirement is is it? The requirement is solely that it adhere to the liner of the of the duct. Right but my point is how do you prove that? How do you prove it? Well doesn't the agency need to expert testimony that a reasonable interpretation of the contract term is that this is what was contemplated and it wasn't done here. I don't believe that that's what the expert testified about. Well let's get do you agree expert testimony is necessary? I do not agree that expert testimony is necessary. If the agency says well you know we've been around for a long time we've seen a lot of cases and it's our view that there's a problem here that's enough. I do not believe that is enough your honor. What would be required if you don't need expert testimony? I believe what you have is the standard that's set forth in the specifications and what the Gallagher Kaiser and Archer Western did is they put the system to work. They doubled the speeds of the fans so the velocities within the ductwork were twice what was the design specification. They ran that work or excuse me they ran those velocities that high velocity purge for over three months and not a question but in any event have the courts held that OPRA itself is an expert as far as determining contract compliance? Well I believe that you don't need expert testimony if that's true then I wondered why the agency as well as the contractor offered expert testimony they didn't well because we were offering testimony to say that it complied and in fact our experts specifically said that there was no standard set forth in the specifications. So the first part of my question have courts held that OPRA itself is an expert? Not that I'm aware of no. All right so how do they prove the contract says do X and your client says we did X in the contract term and the agency offers evidence that there's a problem here. Doesn't it have to offer that evidence through expert testimony? The evidence that was offered through expert testimony was in relationship to there was no expert testimony by either party that said that the ductwork was non-compliant. That's my point counsel. That's exactly right. Expert testimony for the agency to have a hunch. Well arguably so but still arguably so if you look at the information provided by the FAA during the course of the project the FAA said they were reviewing the ASTM documents and standards or testing and they said wait that's not part of our specification. The reason for rejection should be the flaking from the ductwork which was occurring on the round duct. It was not occurring on the rectangular duct. So from our perspective in order to comply with the specifications we look at what the specifications say and does it comply with that specification. And so who told the agency there was a flaking issue as to the round ductwork? It was flaking once they started the system. Who told the agency that? Was it not through expert analysis and expert testimony? No it was not. Well who are these people who are identifying the record as experts who testified that they tested this and they saw the flaking and this was going to be a problem down the road? Those weren't experts your honor. Those were they were people within the organization that saw flakes coming out of the ductwork. All right so I understand that point but who said that's a problem? Maybe that's the way it's supposed to operate. Because the specifications say that the ductwork has to be lined with okay with the uh uh the duct. I think you missed my point here. Okay. Yes the ductwork has to be lined. The contract itself as I read it doesn't say anything about and the coating shall not flake. Is that correct? That is correct. So where is the evidence that flaking means that the coating does not comply with the contract specifications? Because when the coating flakes off there is no longer a lining on the duct. Well where is that evidence coming from? The evidence is from observations visual observations. Yes but counsel we're in an area where normally it's not enough for you know a man on the street to come in and say oh I see it's flaking it must not be operating properly. Well your honor if you were to look inside the ductwork and you were to see that there was no liner there because it had flaked off then you would know. Hypothetically it's the type of liner that you put on it dries and then when it's functioning properly it flakes and then down the road as time passes all flaking occurs and there's no liner left but that's what's contemplated. Well I guess that's an interpretation of the specifications. Oh this is a hypothetical. I understand that your honor but again my position would be that. Put the man on the street who says gee it's flaking that can't be the law and I don't understand the record to even suggest that rather these experts came in to say this shouldn't be happening. Counsel do you acknowledge that evidence of delamination doesn't satisfy our contract requirements right? I mean I thought the evidence was coming from ASTM testing which was showing that there's a failure of adhesion. That is if that is correct there isn't any doubt that you failed to satisfy the contract. You can't have a failure of adhesion in this kind of work and say you satisfy the contract right? Well your honor I disagree with that. No wait wait wait wait go with my question I'm afraid you're going to have to ask something. You cannot have a failure of adhesion and say you satisfy the contract right? When ASTM testing shows there's a failure let's assume that's what the AST testing shows that can't satisfy the contract requirements right? Yes it can your honor because the ASTM standard the ASTM 539 test applied a pressure a thousand over a thousand times greater than what would be in the ductwork. All right forget the ASTM testing you can't have a failure of adhesion and satisfy the contract can you? That is correct and so the the rectangular ductwork didn't have an adhesion failure. It withstood double the velocity. Back to Judge Edwards question. How do we know that? How do we know that? Because it was observed. I gave you a hypothetical counsel that this is the type of coating that you put it on you leave it there for I don't know a month and then it's supposed to flake and it's supposed to disappear because there's been this chemical reaction that's gone on and that's sufficient. Because that isn't. I don't know why you're fighting. Well it's just that it's all down the specifications your honor that's all I'm saying is that it that's not what. Well the specifications say we want a coating. That's correct. Period. Period and that's what. It doesn't tell you what kind of coating. It doesn't tell you whether it's supposed to flake or not. Is it a coating that disappears after six months because it's supposed to? It says this is coating that's supposed to align the ductwork so. For how long? For what time? It depends on the nature of the coating doesn't it and what its properties are and how those properties are supposed to exist and doesn't somebody have to tell the agency if the agency itself is not the expert that having flaking coating is not consistent with the contract specification given the nature of the coating the nature of the vents and what the coating what the contract specification must have intended. Doesn't somebody have to say that to the agency? I think that certainly that would bolster the argument of either the agency or the contractor. All right so you think it's enough that it was rectangular duct was not flaking and to me that's. You're saying that evidence of flaking showed failure and that's what the agency found as to the round. Yes. All right and now the agency argues well manufactured by the same party you know we didn't expect this blah blah blah. Is that enough? Absolutely not. Because it wasn't flaking it was complying with the specifications. How do we know that flaking is inconsistent with the specifications? We need expert testimony. Well and a Judge Edwards question well passed on there was testing. All right you had these people who were familiar with the nature of the coating and what was required by the specification. Yes and we and those experts testified that it was compliant with and even the government's expert after looking at all the evidence at the trial during the hearing agreed that their initial assessment was incorrect and that it was premature and wrong to reject the the rectangular duct. So bottom line they needed expert testimony they didn't have it as to the rectangular ducts. I would agree with that. Mr. Meacham can I ask one hypothetical and one fact question. The hypothetical is this if the rectangular ducts had been flaking would you agree that you failed to satisfy the contract? I believe that if in those locations where it had uh failed then it should have been replaced given the minimal amount of that. Mr. Meacham Mr. Meacham you said failed but you might have meant flaked. Okay so in in locations where if there had been places where the rectangular ducts had been flaking you would acknowledge that that was a failure of the contract correct? At those locations not a wholesale replacement. Okay yes at those locations right? Yes. Okay uh and this is the fact question are the turning vanes part of the rectangular ducts? They are a an appurtenance that are located inside the uh inside the rectangular duct but it's like a filter uh you know like at your house whatever the turning vanes can be removed and replaced and so we offer flaking was there flaking on turning vanes? On a few of them there was and so we offered to remove and replace those. Okay those are all of my questions and I'm sorry if I interrupted Judge Rogers. Okay thank you counsel. Thank you. All right counsel for petitioner. I'm sorry counsel for respondent. Sorry. Good morning may it please the court. This appeal arises from a contract dispute between Archer and the FAA relating to the construction of the McCarran International Airport in Las Vegas Nevada. Archer seeks review of three of the FAA's office of dispute resolution for acquisition rulings that were issued in the course of uh Odridge adjudicating many claims that Archer asserted against the FAA and the argument this morning as to the first issue what's the basis for the agency's disagreement? Your honor on the the first issue on the timeliness or when the delay claim accrued petitioners have asserted a theory of accrual that assumes that they have a direct cost claim and they don't. What they have is a delay claim and I think the court of federal claims case in Zafer is instructive in that it reminds us that we need to focus on the events that triggered the delay that are causing the injury that Archer is complaining about here and the events that in October of 2012 that there was a specification there was an issue with the specification and then uh following Archer raising that issue with the FAA the FAA issued a proposed contract change 16 and we know from Archer's own statement that it is those the combination of those two events that caused its injury which therefore gives rise to the accrual of its claim and we know that because on January 4th 2013 Archer wrote a letter this is an A582 of the record telling its subcontractors to stop work pending quote clear design and direction from the FAA and then February 7 2013. So what is your strongest case for the proposition that the definition of accrual under the regulation that applies in direct cost claim does not apply in delay claims? Your honor that would either be the the ASPCA decision in Robinson which explains that once you know that there is a delay the the length of delay is there is then just the you had no obligation to do anything all right until the agency told you to do something. Now here the contractor finds a problem notifies the agency and meanwhile tells his employees and subcontractors to stop work and we're waiting to see whether the agency is going to say this work must be done according to item 10. Why isn't this case different from what you're describing? Because the injury that Archer suffers is a is a delay. It doesn't cover any injury until it's instructed to do the work. Is that not the argument? That is Archer's argument. On the direct cost claim? Archer doesn't have direct cost claims any longer. But it's applying the standard they're interpreting the regulation and what it requires and I'm trying to find out where you find authority that that interpretation of the regulation does not apply in a delay claim where there has been no instruction to the contractor to do the work in accordance with this contract change proposal. Your Honor, if we for example look at Archer's time impact analysis number six, that's at A611 and 617, Archer directly ties its delay damages to the suspension of its activities due to the issues identified in RFI 804. And then explains further, this is at A617, that due to the time required for the FAA to correct the defective specification and layout, Archer is continuing to suffer delay damages. So the delay damages are fundamentally different kind of claim and a different kind of damage than direct cost claim. So until the contractor is told to do something, the fact that it must stop work under the terms of the previous existing contract terms is not a recoverable cost? Your Honor, it may be a recoverable cost, actually. I mean, Archer's arguing that it wouldn't have any recoverable costs until the notice to proceed is issued, but Archer's actually seeking delay damages going back to its RFI 804, its request for information 804, in October of 2012. And I think what the law is in this situation, I'm the contractor. I have a contract and I discover that one term of the contract isn't going to work. So I notify the agency and the agency says, let us look at this. And so it looks at it and it comes up with a proposal. Meanwhile, the contractors had to stop work. I mean, there's no disagreement here that the stopping of the work was appropriate under the circumstances. Is there? That's right, Your Honor. No, there's no dispute that they... Right. So does a contractor just have to absorb all the delay costs that it suffers when the agency says, go ahead? And now, instead of being able to complete the contract within, let's say, hypothetically 12 months, it's going to take it 16 months. There's no way for the contractor to recover that? I'm just asking. I don't know. Yes, Your Honor, there is a way for the contractor to recover that. The damage, the event that is causing the damage to the contractor is the uncertainty as to what work to perform. And so while waiting for an agency to give direction, a contractor may have a delay claim. Sometimes the delay will not occur until the agency gives a notice to proceed on a different path, but that's not the fact that we have here. And I don't think it's uncommon for a contractor to say to the government, we've found a problem, we need direction, and we can't perform until you tell us what to do. The alternative is the contractor proceeds along the path of the contract, even though it's identified an error, and then have to later on for damages as well. So when the contractor identifies that there is a government-caused delay, which would, if the specifications are defective, that could be a government-caused delay. Once the contractor identifies that there's a need to stop working, that's when the claim would accrue. It accrues when they stopped working because of the uncertainty. You think they should go to ODRRA at that moment? Your Honor, the ODRRA regulations do allow, and actually- Were they required to? They were required to go within two years, yes. Were they required to go to ODRRA? Listen to what my colleague asked, were they required to go to ODRRA at that point? They were required to go to ODRRA within two years of identifying the delay. Why go to ODRRA rather than seek an equitable adjustment? First of all, the contract terms contemplate a request for an equitable adjustment, and it's less adversarial, probably less efficient to first seek an equitable adjustment. I've got the contract language here, it's a JA 136-37. If changes increase the time, I'm adding some ellipses here, but I don't think they're material. If changes increase the time required for performing the work, the contracting officer shall make an equitable adjustment. That's at contract 3-10-1-16-C. Then if you go to E, it says failure to agree to any adjustment shall be a dispute under the disputes clause. It seems to me that it's contemplating a pretty efficient, relatively informal process where a delay happens, it's the government's fault, and the contractor first, before it runs to the arbitrator, the government seeks an equitable adjustment. Then if the government fails to provide the equitable adjustment, then that's a dispute. Failure to agree to it shall be a dispute, and the statute of limitations is two years from once the dispute accrues. Why does your theory, I guess, why not do that? Why shouldn't ARCHER do that? Let's say this happens 50 times over the course of a multi-year contract. Your theory would have them go to ODRRA 50 times when, in fact, they might get an equitable adjustment 49 out of the 50 times. Is that right? Your Honor, the regulations and the contracts require the contractor, when it files a notice of contract dispute with ODRRA, to also serve it on the contracting officer, on the agency, and to attempt an informal resolution. ODRRA recognized that in the opinion on statute of limitations at A17 note 9, ODRRA recognized that ODRRA gets into the adjudicative process only when the parties can't work it out through an informal process. The regulations do contemplate a double track. My understanding is that is because the FAA wants a more flexible and for example, under the Contract Disputes Act. There is a contemplation that there would be a notice of contract dispute filed to preserve your rights, but that ODRRA would not jump in and start the adjudicative process immediately, that there would be time for the parties to try and work it out. Is that somewhere in the record? That does make more sense than what I thought your argument was. Is there somewhere in the record that if a contractor goes to the ODRRA before the equitable adjustment has been decided, that it's normal practice for ODRRA to just stay that proceeding until the equitable adjustment has either been granted or denied? Your Honor, that would be in the ODRRA regulations dealing with the adjudicative process. I'm looking for that citation, Your Honor. Let's see. It would be 14 CFR section 17.29, where the ODRRA process for contract disputes includes an informal resolution period of 20 days for the parties to attempt to informally resolve the dispute. During the informal resolution period, if the parties request it, ODRRA can appoint basically a mediator. It is a very flexible process. Once you file at ODRRA, you've preserved your rights, but there is an opportunity to work out the dispute informally without ODRRA getting into the adjudication and discovery and things like that. In the clock for bringing a claim that the government failed to make an equitable adjustment, begin running before the government fails to make the equitable adjustment? Yes, Your Honor. I think that was the point of the Federal Circuit's analysis in Electric Boat. I recognize it's not binding, but it is well-reasoned. In this scenario, Archer would go to the ODRRA and say, I am challenging the government's failure to make an equitable adjustment. They could do that even before the government has decided whether to make an equitable adjustment. Your Honor, the claim would really be that Archer is entitled to delay damages. That's why you look at the accrual of the delay claim. And because there's no requirement to exhaust any kind of administrative remedy, as was the case in Electric Boat, they can go to ODRRA and file that claim without seeking an REA, a request for equitable adjustment. Thank you. I was going to move on to the cumulative impact claim. Okay. Your Honor, the cumulative impact claim is quite a distinct claim. It is a not a delay claim. It is not a direct damages or direct cost claim. And what Archer filed in its notice of contract disputes was claims that had specific headings that were addressed to specific discrete and independent events. And what's lacking from ODRRA is concern about overall cumulative claims pervading the entire project. And so ODRRA committed no error when it held that ODRRA had no record of Archer filing a cumulative impact claim on behalf of the contractors. What Archer points to are discrete paragraphs in the in its notices of contract dispute that relate to specific events, the ductwork or glass panels, PCC 16. But nowhere does Archer suggest either in the labels of its claims or just in its allegations that it has a claim based on all of those events taken together plus some additional ones that give rise to a cumulative impact claim. And so the court should affirm ODRRA's finding that Archer did not timely file its cumulative impact claim. The last issue that Archer raises is with the ODRRA's conclusion that the FAA reasonably rejected the rectangular ducts. This is an issue that raises a question of whether there's substantial evidence supporting ODRRA's decision. And that is, as the court is aware, means more than a scintilla of evidence but less than a preponderance of the rectangular duct to be conforming. The antimicrobial coating had to form the interior surface of the duct. That's the specification requirement. Form the interior surface of the duct. That's at A125 through 126 of the record. And what that means in Archer's own words in its reply brief is that the adhesion requirements on this project, I'm quoting, was for the coating to form the interior surface of the duct and not delaminate. So forming the interior surface of the duct means that it has to adhere and not delaminate. And at that point, or at this point, we are now into a factual question about whether the coating for the rectangular duct was adhering. You're saying that as you read the record, there was no dispute about that before the agency? I don't believe so, Your Honor. Everyone agrees. Right. Archer's reply brief says that the adhesion requirements on this project was for the coating to form the interior surface of the duct and not delaminate. And it was the delamination of the round ducts that triggered a concern about whether the coating was adhering to both the round duct and the rectangular duct. But, Your Honor, it doesn't have to delaminate in order for it to be nonconforming. There could be other indications that it is not forming, that's the language in the specification, that it will not form the interior surface of the duct. Just tell us in your view, what was the substantial evidence, according to the finding with respect to the rectangular ducts, that there is a significant enough likelihood of delamination that you should prevail? What's your evidence? The evidence would be the almost unanimous reliance on the ASTM D3359 testing, which indicated that there was a wild variation in the level of adherence. There were 68 examples of a zero B rating on the rectangular duct. And that coupled with the delamination in the turning vanes, coupled with the fact that the experts were testifying that there was oil present in both the round and the rectangular ducts, albeit less on the rectangular ducts. And then you had... So counsel's going to come back and say the standard, all of that I understand what you said. They're going to come back and say, but the standard was more than what was required. The ASTM standard, what's your answer to that? My answer to that is that that is fundamentally a factual dispute about what test should be used to assess whether the coating is adhering or yeah, is adhering to the rectangular duct. No, not adhering, will likely not adhere is really what your argument on rectangular is. That's right. Right. Because you didn't have any, any visual evidence with respect to the rectangular issue. You're talking about the likelihood of failure, right? I just want to make sure I understand. Okay. And so tell me now what your answer would be to their argument that will be coming, which is that the standard is more than is required under the contract. That is my, my response to that, your honor, is that the ODRA fact finder had listened to the expert testimony of Archer's expert, Mr. Rudd, found that his, listened to him, heard him say that he thought it was too rigorous of a test. And she, as the fact finder, ODRA as the fact finder rejected that testimony in favor of evidence relating to the ASTM D3359 test and the testimony that there was oil present on. Why is the test being rejected? I mean, the evidence with respect to the test. The ODRA rejected the test, the test that Mr. Rudd, the petitioner's expert, because he had essentially used a watered down test. He took a standardized test and then modified it to the point that it really no longer had... Okay. No, that's not the gap. The gap, I'm just trying to make sure I understand this. The issue is they didn't reject the plaintiff's test. I understand that, but they accepted the standard test, which they claim now was more than is required. And what was the fact finding with respect to that? The more than required, was there some answer given to that? In other words, the test that you're looking to, they're saying is more than was required. ODRA found that it was reasonable for the parties to rely on that test because everyone had been looking at it before, had been using the test before the litigation. So when Archer hired SME to investigate the delamination, SME, Soils and Management Engineering, turned around and used the ASTM test. When GK hired SME to look at it, they used... SME used ASTM test. BioShield, the coating manufacturer, also used that test. So ODRA found that it was reasonable for FAA to rely in part on that test because that's what everyone else was using. Okay. I hear your answer. Thank you. The turning vanes are part of the rectangular ducts. Is that correct? My understanding is that they are part of the rectangular duct. They may be sort of a... I want to say unique part of the rectangular duct, but they are part of the rectangular duct. Why does... I mean, this is a friendly question. Why does the delamination, the turning vanes, not equate to a failure by Archer to strictly comply with the contract? Or does it? The turning... The delamination, Your Honor, in the turning vanes was an indication that there could be delamination in the rectangular vanes, but it was not... It was not... They are of a slightly different nature. And so to be candid, I don't think that the delamination and the turning vanes alone would be a basis for reducting... For rejecting all of the rectangular ducts. That's helpful. I appreciate the candid. If there are no further questions, then we respectfully request that the court affirm the decisions of ODRA. So let me be clear here. So I understand what the test that ODRA was relying on showed as to the rectangular vents. Your Honor, what it showed was that in various places in the rectangular duct, there was an adhesion rating of as low as zero. And then sometimes an adhesion rating as high as five. And there were 68 instances where there was an O5 rating. I'm sorry, a zero rating. And where did the evidence come from that adhesion in the rectangular vents was improving? That was the... Comparing test results from... I believe, Your Honor, it was like a June test result to some earlier test results using the ASTM 3359 test. That's the test ODRA relied on. Right. It was improving in some areas. And then in other areas, it was getting... So with that evidence, what was the basis for requiring replacement of all the rectangular vents? The basis for it was the concern that there would be... That some of the rectangular duct was likely to delaminate during the... What I'm getting at is there were these problems, 68 problems, let's say, in discrete places. And there was evidence that adhesion was improving over time. Nevertheless, ODRA had substantial evidence for ordering removal of all... Replacement of all coating on doesn't adhere great everywhere at the beginning. But then over time, the testing shows its adherence levels are improving. Your Honor, the adherence levels were improving in some places, but not across all of the rectangular ducts. And what ODRA said at A97 of the record was that the record showed that the test results on the rectangular ducts were similar to that of the round ducts in various places. And so... Here's my question. Suppose the ducts are, I don't know, what, half a million feet long and the 68 places amount to a thousand feet. I didn't find, and maybe I missed it, any suggestion that the thousand-feet problem dispersed over this hugely long vent meant everything had to be replaced. That's what I'm trying to understand. Where's the substantial evidence for that? When the evidence was adhesion was improving. Your Honor, it would be impossible for the agency to identify just the areas where there is... So let me back up, Your Honor. What they're doing is sort of spot testing the ducts. They could not test the entire duct for adhesion levels across the entire duct. And so there's spot testing. Because it would just be too costly to do so? My understanding of the test, Your Honor, is that it is essentially destructive. So you would... I see. I think you'd have to take the ducts out to test them, and that would be counterproductive. And so what OGER is looking at is, okay, here's this evidence of adhesion levels being, you know, varying throughout the duct. Improving, improving, improving. Improving in some areas. Do we know that these are not the 68 areas? I don't see an answer to that, Your Honor. Yeah. I didn't see any equation on that. Okay. Thank you. Anything further on substantial evidence? No, Your Honor. Thank you. So for these reasons, we ask that the court affirm the board's OGER's decision. All right. Are we ready for the reply? Mr. Stirl? Yes. There we go. I just had to unmute. Thank you. Yes, Your Honor. Ready for the reply. Thank you. Just a few points first on the proposed change item 16 or change 16 item 10. Counsel for the FAA just referenced the Robinson case, and that case is distinguishable because there, the contractor thought it had to wait till the very end of the project till all the work was done before it could even file a claim. That's not what Archer Western here is arguing, but importantly, in Robinson, the claim held, or the contractor, excuse me, the court held that the claim accrued when the contractor actually began performance of the changed work. Here at the earliest, that was when there was an order to do that work, and at the latest, it was when the administrative process, the REA process described in the contract had been exhausted. In fact, Counsel for the FAA just stated with respect to the electric boat case that in that case, there was no requirement to exhaust an administrative remedy. So that case is distinguishable here. With respect to disruptions then, two quick points on that. The Norman case, which was decided by the NASA Board of Contract Appeals, found that where there was a waiver of direct costs, cumulative impact claims were not waived. They could arise from the same operative facts and reference the Placeway Court where the federal circuit reversed the Court of Federal Claims when the Court of Federal Claims put too much emphasis on form over what facts were actually pled. Here, the notice of... But where is the additional allegation that was needed here? With respect to disruptions, Your Honor? With respect to the overall disruption. In other words, there was a disruption as to this matter, that matter, this matter, that matter. And moreover, as to the entire project, there were these disruptions. Understood. Thank you. So here... That latter part in your client's petition, too. So here, the references to cumulative impacts are in the 4,000 plus pages of supplemental information that ultimately became part of the dispute file, which is similar to the Resnick case, which was an ODRA decision that found that they would not be, quote, overly technical, unquote, about what constitutes a notice of... And so what do we find in the supplemental record that says, in addition to all these individual problems, there was this overarching problem? There are references throughout that documentation, Your Honor, portions of which are in the appendix. The whole thing is not in there, but portions are that reference cumulative impacts, trade stacking, ripple effects, and these are all synonymous terms related to and reflecting cumulative impact claims. All right. So ripple effect, and what's the other? Trade stacking. Inefficiencies are others. Lost productivity is another synonymous term. And the agency never considered this? Is that your argument? That's correct, Your Honor. And for that reason, we would ask that the court find that the disruption claim was arbitrarily dismissed as untimely, and that the proposed change, 16, item 10, was similarly arbitrarily dismissed for... So in your opening brief, do you cite to this supplemental record specifically to ripple effect, trade stacking, lost profit? Yes, Your Honor. There are references in there to the supplemental information that became part of the dispute file. I understand that, but specifically as to these items that you've just identified. As to these terms, ripple effect, and lost productivity? I believe so, Your Honor. I'm sorry I don't have the paper. Well, I'm sorry too, because I didn't find them. Doesn't mean they're not there. I didn't find them. That's what I was asking for, something more than these discrete claims, this additional argument. And in your brief, you're saying you didn't cite them, other than refer to this supplemental material. I'm saying we did, Your Honor, and part of the supplemental materials are part of the record. You have to understand what I'm getting at. If you tell the agency we have a cumulative impact claim, and all you have to do is look at these supplemental materials. And here are a thousand pages. Where? What, specifically? That's what I'm trying to understand. And the argument is, that wasn't done here. That the lines were not connected from the notices to the supplemental information, is that correct? No, that the supplemental information, in fact, cured the defect. We believe it did, Your Honor, to the extent there was a defect to begin with, and the FAA was not prejudiced because they filed responses. No, no, no, counsel, what I'm saying is, I didn't see it in your brief, and I am happy to acknowledge maybe I overlooked it, but that's what I was looking for. Something that said, if you look in the supplemental filing, you will see at A, whatever, that we had this ripple effect, we had lost profits, et cetera. Those references were made to the FAA, Your Honor, and the FAA responded there, too, for over three and a half years with expert testimony. So, my point is, Your Honor, if they had never been, if the lines had never been connected, if the references to the supplemental information... All I'm getting at is, you're in the Court of Appeals, and in your opening brief, don't you have to identify with some specificity the nature of your claim? Then the agency comes forth and says, well, you made all these discreet claim arguments, but you never alleged the cumulative overall impact aspect of your claim. So, I would have expected on the fly that you would have said, no, if you see the supplemental record at whatever it is, J or A, you'll see, and I didn't see that there either. In other words, whose burden is it to identify the record to support your claim? And you'll notice that the agency is saying all you did was make these discreet claims. At the outset, I agree, Your Honor, it's Archer Western's burden to provide notice to the FAA of those claims, but then in deciding whether those claims were timely alleged or adequately alleged, I think the case law establishes that the ODRA has to look at not only the notice of contract dispute, but the information that was provided to support it with further detail, like the Resnick case. All right. Thank you, counsel. Thank you. Your Honor, in regards to a couple of things, in regards to expert testimony, we do believe that expert testimony is necessary to establish whether there's going to be future delamination, and we do not have that in this case. There was no expert, there was no one from ODRA that was qualified to make a determination as to whether there would be future delamination of the rectangular duct work. On review that's just inquiring into whether there was substantial evidence, why is it not enough for the government to say, everyone agrees the round ducts didn't meet standards, they didn't meet standards because they weren't cleaned in an appropriate way before the special stuff was put on them, and the same people who didn't clean them well were the people who were responsible for cleaning the rectangular ducts well. I can address that, Your Honor, because even the FAA acknowledged early on in the process that there was a different methodology that was being used to manufacture the rectangular duct versus the round duct. When you manufacture the round duct, there's an oil material that is lined that helps in the circulation in preparing the round duct. You don't have that with the rectangular duct. The rectangular duct is just bent with a breaker. Let's say I hire someone to clean my house and they use a certain method for cleaning the floors and they use a certain method for cleaning the carpets and they do a terrible job with the floors. Isn't there at least a scintilla of evidence they probably did a crummy job on the whole house? We don't know whether they were the same laborers or whatever. That's like saying somebody is convicted of a crime given the fact that it was in the same environment, his brother was raised in the same environment, the same people, the same education. He also has a problem there. There's just no link to the manufacturing process and that the same people were doing it. The other thing I'd like to raise is the 68-0 tests that the government raised. The 68-0 tests were not taken while the duct work was in place. The ducts were tested after the duct had been demolished. It had been ripped out of the building. It had been taken into a garage where it was twisted, mangled, whatever. The tests were made there. We do not believe that that is an accurate way to take the test. That was done after the duct work was removed. All of the tests that were done prior to the duct work being removed showed a significantly higher adhesion test using the ASTM 359. In addition, the government's own expert witness testified that the ASTM D359 was too rigorous for this application. The government talked about the air velocity test, which there is an ASTM abrasion test where you shoot air against the surface to see if it will delaminate. Because this is a filtered system, there is no sand or anything else. The expert just used velocity air. What he found was even on the 0B test that the government had rejected, that the velocities were stood pressures of 5 to 13 times higher than what would be experienced in the conditions that the duct work were operating in. In addition, on those tests, the government raises, well, this is what was used by everyone. Well, keep in mind that the first test that was done, where they tested the rectangular duct, there were 28 locations where they tested and two of them showed zero. Well, the government, as well as Gallagher-Kaiser and Archer-Westerner said, this is a general test to give an idea of adhesion. It is not a spot test. You don't look at the outliers. What happened is even though the test is fine, it doesn't look like the rectangular duct has to be removed. It is acceptable. During the course of the project, when the government was addressing the ASTM test, they were also saying, Gallagher-Kaiser and Archer-Westerner, well, what is satisfactory? What is a passing test? Is it going to be a 2B, a 3B, a 1B, whatever? The government gave absolutely no indication. The government did a wholesale rejection of the rectangular duct based upon conjecture and speculation without expert testimony, without expert opinion as to whether this would delaminate in the future. All right. Anything further? Nothing further, Your Honor. Thank you. We'll take the case under advice. Thank you for your time today.
judges: Rogers, Walker, Edwards